## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DENYSE H. MORALES, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.  10-1368 |
| PNC BANK, N.A., | : | |
| | : | |
| Defendant. | : | |

### MEMORANDUM

BUCKWALTER, S. J.                                                                 August 4, 2011

     Currently pending before the Court is Defendant PNC Bank, N.A.'s Motion to Dismiss

Plaintiff's Religious Discrimination and Retaliation Claims Pursuant to Federal Rule of Civil

Procedure 12(b)(6).  For the following reasons, the Motion is granted in part and denied in part.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

     According to the facts set forth in the Amended Complaint, Plaintiff Denyse H. Morales is a

forty-five year old, Hispanic/African-American female from Trinidad and a practicing Jehovah's

Witness.  (Am. Compl. ¶ 1.)  During the times relevant to this action, she was employed as a

Licensed Financial Sales Consultant at Defendant PNC Bank, N.A.'s ("PNC") branch facility in

Rydal, Pennsylvania.  (Id. ¶ 2.)  She was originally hired on July 10, 2006, to sell certain financial

products and services to customers of PNC.  (Id. ¶¶ 28, 30.)  As part of her job duties, and in

addition to her required investment revenues, she was expected to achieve revenue sales from new

loans, new checking and savings accounts, and new business accounts, which would then be

referred to PNC's business bankers.  (Id. ¶ 39.)  Plaintiff's supervisors at the Rydal branch facility

were Branch Manager Audrey Ackaa, who is a black female with a Nigerian national origin, and

Raza Gilani, who is a Pakistani male.  (Id. ¶ 38.)

During her first month of employment, Plaintiff did not meet her revenue requirements and, thus, was required to attend evening calling sessions to solicit business.  (Id. ¶ 40.)  According to Plaintiff, other similarly situated employees of PNC were not required to attend such sessions.  (Id. ¶ 43.)  These calling sessions were scheduled by PNC to take place on Tuesday, Wednesday, and Thursday nights, until 7:30 p.m.  (Id. ¶ 42.)  Plaintiff explained to management, however, that she had religious obligations on Tuesday and Thursday nights that would prevent her attendance at the calling sessions.  (Id. ¶ 42.)  Ms. Ackaa responded that because PNC had to meet its goals, Plaintiff needed to make arrangements to attend the call sessions, as they were more important than any of Plaintiff's religious and other obligations.  (Id. ¶ 44.)  Plaintiff then advised Ms. Ackaa that she could attend Wednesday night call sessions provided she received sufficient advanced notice to properly plan her schedule.  (Id. ¶ 45.)  Ultimately, Plaintiff attended the required call sessions.  (Id. ¶ 46.)

In October 2006, Defendant PNC sent invitations to its employees for a party scheduled to take place on Halloween, October 31, 2006.  (Id. ¶ 47.)  Upon Plaintiff's receipt of this invitation, she advised both Ms. Ackaa and Mr. Gilani that she would not be able to attend.  (Id. ¶ 49.)  When Mr. Gilani indicated that her attendance was "mandatory," she replied that, for religious reasons, she does not celebrate Halloween or participate in parties affiliated or associated with Halloween.  (Id. ¶ 51.)  Mr. Gilani responded that PNC spent a significant amount of money for the party, that management expected all employees to attend, and that Plaintiff did not have a good excuse for not attending.  (Id. ¶ 52.)  He went on to note that the party was not a religious event, but rather a way for PNC to express its appreciation for its employees, and that Plaintiff did not have to wear a costume.  (Id. ¶ 53.)  On the date of the party, employees brought costumes to work and changed into them after-hours before heading over to the nearby restaurant.  (Id. ¶¶ 54-55.)  When Ms. Ackaa

2

again asked Plaintiff about her attendance, Plaintiff reminded her that she could not attend for religious reasons.  (Id. ¶¶ 56-57.)  Ms. Ackaa repeated Mr. Gilani's previous sentiment that this was an employee appreciation party and not a Halloween party.  (Id. ¶ 58.)  The following day, however, Plaintiff learned from other employees that there were pumpkin carving and costume contests.  (Id. ¶ 59.)  Ms. Ackaa told Plaintiff that she missed a great time, that she could not believe Plaintiff did not attend, and that Mr. Gilani was upset about her absence because it showed she was not a "team player."  (Id. ¶ 60.)  Plaintiff apologized and repeated that if it were an event without reference to Halloween and occurred on any night other than Tuesday or Thursday, when she had religious obligations,[1] she would have attended.  (Id. ¶ 61.)  Plaintiff was the only person from her sales team who did not attend the party.  (Id. ¶ 62.)

Prior to this incident, Plaintiff's performance record was positive and she received several accolades.  (Id. ¶ 63.)  From this point forward, however, her relationship with management deteriorated.  (Id. ¶ 64.)  Shortly after the party, Mr. Gilani asked Plaintiff about her strategy to achieve the goals set by PNC for her.  (Id. ¶ 65.)  When Plaintiff explained that she was doing all that she could to meet her numbers, she was told that if she did not make her numbers, she would be subject to Disciplines in the form of corrective actions.  (Id. ¶ 67.)  Plaintiff believed that other similarly situated PNC employees were also not meeting their numbers at this time, but none were being scrutinized like she was.  (Id. ¶ 68.)  When she asked about the perceived disparate treatment, Ms. Ackaa told her not to worry about anyone but herself.  (Id. ¶ 69.)

On June 5 and June 11, 2007, Plaintiff received corrective action notices for failure to meet her required numbers.  (Id. ¶ 70.)  In particular, Defendant PNC placed her on probation for not meeting her sales revenue requirements, even though other employees who also did not meet the

---

[1]  The Court takes judicial notice that October 31, 2006 fell on a Tuesday.

requirement were not placed on probation.  (Id. ¶¶ 72-73.)  While on probation, she was denied

commissions, bonuses, pay increases, and opportunities for promotions.  (Id. ¶ 74.)  Plaintiff

inquired into PNC's failure to pay commissions, and Defendant advised that commissions, bonuses,

and pay increases are not paid to an employee while on probation.  (Id. ¶¶ 75-76.)

     In November 2007, Plaintiff sent a letter to Mr. Gilani stating that she had done everything

she could possibly do to meet her numbers.  (Id. ¶¶ 78-79.)  She expressed her desire to succeed and

indicated that her success required assistance from the branch.  (Id. ¶ 80.)  As such, she requested

the opportunity to study for the License Series 65, which would allow her the opportunity to offer a

wider and more appropriate array of investment alternatives to the elderly customer base at the

Rydal branch facility.  (Id. ¶¶ 81-82.)  Plaintiff's letter went on to raise her concern that her recent

assignments to cover staffing shortages at other branches (Jenkintown for four months, Welsh Road,

Abington, Glenside, and Willow Grove) were detrimentally affecting her ability to meet her

required sales numbers, when other similarly situated employees were not moved as frequently as

she was.  (Id. ¶¶ 84, 86.)   Finally, Plaintiff advised that, according to several of her customers, other

employees at the Rydal branch were stating that Plaintiff no longer worked for PNC.  (Id. ¶ 85.)

None of Plaintiff's concerns were ever addressed by Defendant.  (Id. ¶ 87.)

     On November 30, 2007, shortly after her letter, Ms. Ackaa issued Plaintiff another

Discipline for failing to achieve her investment revenue goals.  (Id. ¶ 88.)  Upon receipt of this

Discipline, Plaintiff met with Ms. Ackaa, at which time Plaintiff again explained that she was

limited in the products she could sell.  (Id. ¶ 90.)  She repeated her desire to study for the License

Series 65 to put her in a better position to meet her stated objectives and sell products that were

more compatible with the customer base she serviced.  (Id. ¶¶ 91-92.)  Ultimately, however, Ms.

Ackaa told her that she needed to perform at a higher level for several months in order to be

considered for the exam.  (Id. ¶ 94.)

4

On January 18, 2008, Defendant PNC issued Plaintiff another corrective action for alleged poor performance and failure to meet revenue numbers.  (Id. ¶ 95.)  This notice stated that "[c]ontinued failure to meet the expectations set as outlined above may lead to even further Disciplinary Action, up to and including Termination."  (Id. ¶ 96.)  Several months later, on April 25, 2008, Plaintiff arrived for work and was terminated for her performance issues.  (Id. ¶ 97.) Thereafter, on May 2, 2008, Plaintiff received a letter from Defendant notifying her that, in addition to terminating her employment, PNC had terminated her professional license.  (Id. ¶ 98.)

Shortly after her termination, Plaintiff met with representatives from the Equal Employment Opportunity Commission ("EEOC") to initiate the filing of a Charge of Discrimination.  (Id. ¶ 9.) According to Plaintiff, she specifically noted that she was a practicing Jehovah's Witness, and she discussed the facts surrounding her refusals to attend either the Halloween party or the calling sessions scheduled on her religious meeting nights.  (Id. ¶¶ 10-12.)  Further, she included allegations concerning religious discrimination and her concerns that the alleged adverse employment actions taken against her by Defendant were retaliatory.  (Id. ¶ 13.)  As part of the intake process, Plaintiff was required to complete and verify EEOC Intake Questionnaires.  (Id. ¶ 14.)  Ultimately, on June 2, 2008, Plaintiff, acting *pro se*, filed a Charge of Discrimination with the EEOC, and requested that this Charge be dual-filed with the Pennsylvania Human Relations Commission ("PHRC") in accordance with the Pennsylvania Human Relations Act ("PHRA").  (Id. ¶ 16.)

On December 29, 2009, the EEOC issued Plaintiff a "Dismissal and Notice of Rights" ("Right to Sue letter"), finding no evidence of discrimination.  (Id. ¶ 24.)  The Right to Sue letter also noted that Plaintiff had the right to file a lawsuit in federal court within ninety days from the date of that notice.  (Id. ¶ 25.)  As such, on March 29, 2010, Plaintiff initiated the current action in federal court.  Following an initial Motion to Dismiss by Defendant, Plaintiff filed an Amended Complaint on February 17, 2011, setting forth five counts for relief: (1) race discrimination under

Title VII of the Civil Rights Act of 1964 ("Title VII"), (2) religious discrimination under Title VII;

(3) national origin discrimination under Title VII; (4) retaliation under Title VII; and (5) violation of

the Pennsylvania Human Relations Act.  (Id. ¶¶ 100-37.)  Defendant, in turn, filed another Motion

to Dismiss on March 17, 2011.  Plaintiff provided her Response on July 13, 2011, and Defendant

submitted a Reply Brief on July 22, 2011, making this matter ripe for disposition.

## II.      STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not

stated a claim upon which relief can be granted.  FED. R. CIV. P. 12(b)(6); see also Hedges v. United

States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the

United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do."  Id. at 555.  Following these basic dictates, the Supreme

Court, in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), subsequently defined a two-pronged approach to

a court's review of a motion to dismiss.  "First, the tenet that a court must accept as true all of the

allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at

1949.  Thus, although "Rule 8 marks a notable and generous departure from the hyper-technical,

code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff

armed with nothing more than conclusions."  Id. at 1950.  Second, the Supreme Court emphasized

that "only a complaint that states a plausible claim for relief survives a motion to dismiss."  Id.

"Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals

observed, be a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense."  Id.  Where the well-pleaded facts do not permit the court to infer

more than the mere possibility of misconduct, the complaint has alleged, but not shown an

entitlement to relief.  Id.; see also Phillips v. County of Allegheny, 515 F.3d 224, 232-34 (3d Cir.

2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2)

complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual

allegations must be enough to raise a right to relief above the speculative level.'" (quoting

Twombly, 550 U.S. at 555)).

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of review

have remained static.  Spence v. Brownsville Area Sch. Dist., No. CIV.A.08-626, 2008 WL

2779079, at *2 (W.D. Pa. Jul. 15, 2008).  The general rules of pleading still require only a short and

plain statement of the claim showing that the pleader is entitled to relief and need not contain

detailed factual allegations.  Phillips, 515 F.3d at 233.  Further, the court must "accept all factual

allegations in the complaint as true and view them in the light most favorable to the plaintiff."  Buck

v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006).  Finally, the court must "determine

whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."

Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III.    DISCUSSION

Defendant PNC moves to dismiss Plaintiff's claims for religious discrimination and

retaliation on that ground that she never raised any such allegations in her formal EEOC Charge of

Discrimination.  Defendant claims that because Plaintiff failed to exhaust her administrative

remedies for these claims, they are subject to Rule 12(b)(6) dismissal.  The Court considers each

claim individually.

### A.    Religious Discrimination

A Title VII plaintiff is required to exhaust all administrative remedies before bringing a

claim for judicial relief.  42 U.S.C. § 2000e-5(e); Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996);

DeLa Cruz v. Piccari Press, 521 F. Supp. 2d 424, 431 (E.D. Pa. 2007).  To do so, the plaintiff must

"fil[e] a timely discrimination charge with the EEOC." DeLa Cruz, 521 F. Supp. 2d at 431 (citing

Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)). The purpose of this requirement is "(1) to

ensure 'that an employer is made aware of the complaint lodged against him and is given the

opportunity to take remedial action,' and (2) to give 'the EEOC the opportunity to fulfill its statutory

duties of eliminating unlawful practices through the administrative process.'" O'Donnell v.

Michael's Family Rest., Inc., No. CIV.A.07-5386, 2008 WL 2655565, at *2 (E.D. Pa. July 1, 2008)

(quoting Jackson v. J. Legis Crozer Library, No. CIV.A.07-481, 2007 WL 2407102, at *5 (E.D. Pa.

Aug. 22, 2007) (citing Bihler v. Slinger Co., 710 F.2d 96, 99 (3d Cir. 1983)))).[2]  In Title VII actions,

failure to exhaust administrative remedies is an affirmative defense on which the defendant bears

the burden of proof. Williams v. Runyon, 130 F.3d 568, 573 (3d Cir. 1997).

The administrative exhaustion requirement, however, "is tempered by a fairly liberal

construction given to EEOC charges." Schouten v. CSX Transp., Inc., 58 F. Supp. 2d 614, 616

(E.D. Pa. 1999). Generally, a Title VII plaintiff cannot bring claims in a civil lawsuit that were not

first included in an EEOC charge and exhausted at the administrative level. Burgh v. Borough

Counsel of Montrose, 251 F.3d 465, 469-70 (3d Cir. 2000). The mere failure to check a specific

box on the EEOC charge form is not a fatal error. Doe v. Kohn Nast & Graf, P.C., 866 F. Supp.

190, 196 & n.2 (E.D. Pa. 1994). Rather, "[t]he most important consideration in determining

whether the plaintiff's judicial complaint is reasonably related to his EEOC charge is the factual

statement." Id. at 197. Thus, "if the allegations made in the complaint filed in this Court could be

---

[2] "Although the PHRA does not contain an analogous [exhaustion of administrative remedies]
requirement, courts have held that the PHRA should be interpreted consistently with Title VII."
McLaughlin v. Rose Tree Media Sch. Dist., 52 F. Supp. 2d 484, 491-92 (E.D. Pa. 1999)
(citations omitted). "To bring suit under the PHRA, a plaintiff must first have filed an
administrative complaint with the PHRC within 180 days of the alleged act of discrimination."
Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997) (citing 43 PA. CONS. STAT. §§
959(a), 962).

'reasonably expected to grow out of' those contained . . . in the EEOC charge, the pleading of the

plaintiff will withstand a motion to dismiss, as the administrative remedies available to plaintiff will

have been exhausted." Schouten, 58 F. Supp. 2d at 616 (quoting Page v. ECC Mgmt. Servs., No.

CIV.A.97-2654, 1997 WL 762789, at *3 (E.D. Pa. Dec. 8, 1997)) (further quotations omitted).

Stated differently, where a plaintiff attempts to assert a claim at the district court level which was

not raised in the administrative charge, the claim is considered exhausted if it is "fairly within the

scope of the prior EEOC complaint, or the investigation arising therefrom." Antol, 82 F.3d at 1295

(quoting Waiters, 729 F.2d at 237).  A reasonable EEOC investigation should include claims not

specifically mentioned in the EEOC charge "where there was a close nexus between the facts

supporting the claims raised in the charge and those in the complaint." Pourkay v. City of

Philadelphia, No. CIV.A.06-5539, 2009 WL 1795814, at *5 (E.D. Pa. June 23, 2009) (citing Howze

v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984)).  "In such a case, the Court

may reasonably expect an awareness on the part of the defendant that such allegations are likely."

Schouten, 58 F. Supp. 2d at 616-17.

For example, in Schouten v. CSX, the plaintiff brought a federal suit for discrimination

based on race, national origin, and retaliation.  Id. at 615.  Considering whether the plaintiff had

exhausted his administrative remedies on the national origin discrimination claim, the court

remarked that although Plaintiff did not check the "national origin" box on the EEOC charge form,

such a claim could be reasonably expected to grow out of the allegations claiming race

discrimination.  Id. at 616-17.  Plaintiff had expressly stated, in his EEOC charge, that: "[o]n April

10, 1998, Don [Parkers] and Sam indicated that I had an accent and would not be a good

conductor."  Id. at 617.  The court found that "[t]hough not an explicit allegation of discrimination

based on national origin itself, this statement should have led [defendant] to believe that such a

claim was possible."  Id.  The court went on to remark that it seemed "possible, if not probable, that

[the plaintiff], who [was] unschooled in the technical distinction between racial and national origin discrimination, assumed that the actions [on the part of defendant] constituted the former as opposed to the latter." Id. "In such situations, 'not to allow the lawsuit would . . . penalize . . . a lay person for not attaching the correct conclusion to [his] claim and thus would . . . constitute . . . an improperly narrow construction of Title VII.'" Id. (citing Rodriguez v. Am. Parts Sys., No. CIV.A.86-3904, 1986 WL 13034, at *2 (E.D. Pa. Nov. 19, 1986)).

By contrast, in Barzanty v. Verizon Pa., Inc., 361 Fed. Appx. 411 (3d Cir. 2010), the plaintiff brought a federal complaint alleging gender discrimination and hostile work environment, despite raising only a gender discrimination claim to the EEOC. Id. at 412-13. The Third Circuit found that the hostile work environment claim was not within the scope of the EEOC charge. Id. at 414. In particular, it remarked that the plaintiff's two claims "related to separate occurrences. Although her former supervisor . . . was allegedly involved in both incidents, the gender discrimination claim involved the discrete act of [the defendant's] termination of [the plaintiff's] employment, while the hostile work environment allegation involved continuing occurrences unrelated to her discharge." Id. at 414. Because the facts underlying each claim were separate, the court deemed the hostile work environment claim not exhausted. Id. at 415.

Similarly, in Sencherey v. Stout Rd. Assoc., Inc., No. CIV.A.09-2856, 2011 WL 499981 (E.D. Pa. Feb. 11, 2011), the plaintiff had filed a charge of discrimination with the EEOC, which included a sole count of gender discrimination, with no reference to her race or national origin. Id. at *3. She specifically averred that she was discharged by the defendant while on maternity leave, despite having provided documentation that she was still under medical care. Id. She made no reference to discrimination on the basis of race or national origin and only placed an "x" in the box pertaining to gender discrimination. Id. Her subsequent complaint in federal court, however, set forth additional claims of race and national origin discrimination. Id. The court found that aside

from failing to check the pertinent box, there was "no averment in the body of her [EEOC] Complaint . . . that would raise an inference of race and/or national origin discrimination." Id. at *6. It went on to hold that because "[p]laintiff did not aver that she was discriminated against as a black female individual nor as a West African female individual[,] . . . the EEOC could not reasonably be expected to have investigated Plaintiff's allegations of discrimination on the basis of race and national origin." Id. at *6.

Finally, in Mullen v. Topper's Salon & Healthcare Spa, Inc., 99 F. Supp. 2d 553 (E.D. Pa. 2000), the court held that the plaintiff failed to exhaust her administrative remedies with respect to her sex discrimination claim because it was not within the scope of the plaintiff's EEOC charge, which alleged solely religious discrimination. Id. at 555-56. As the bases for its decision, the court made the following findings: (1) only the "religion" box in the section entitled "cause of discrimination based on" was checked; (2) the factual allegations in the charge of discrimination consistently referred to harassment due to her "moral convictions and beliefs;" and (3) the final statement on her charge read, "I believe I have been discriminated against because of my religion, Christian, in violation of Title VII of the Civil Rights Act of 1964, as amended." Id. at 556.

Similarly, in the present case, the Court finds that Plaintiff's religious discrimination claims did not fall within the scope of her EEOC charge. Indeed, the four administrative documents supplied by Defendant reveal allegations of only race/national origin discrimination and retaliation, with no mention of any facts relating to the purported religious discrimination.[3] First, on her intake questionnaire, Plaintiff checked only the boxes for race discrimination and retaliation. (Def.'s Mot. Summ. J., Ex. A.) When asked to describe the actions she believed were discriminatory, she stated:

---

[3] "In an employment discrimination case, a court may consider administrative documents, such as a plaintiff's charge filed with the Equal Employment Opportunity Commission (EEOC), without converting the motion to dismiss to a motion for summary judgment." Carl v. W.-S. Life Ins. Co., No. CIV.A.09-3990, 2010 WL 3860432, at *2 n.2 (E.D. Pa. Sept. 30, 2010).

> I was placed on probation for "failing to make my numbers" however, no other
> employee in my position was making their numbers.  I addressed my concerns to my
> regional manager only to be told that "this is about you not anyone else."  I also
> asked [m]y regional manager (Raza Gilani) to allow me to study for an additional
> investment license so that I could have a better chance of making the numbers.  He
> denied my request stating that I had to have three consistent months of solid numbers
> in order to be given the opportunity to take the test.  However, he allowed another
> employee in my position to study for the test during working hours and to take the
> exams with an added opportunity for a promotion upon completion of the test.  I have
> documented proof that she was not making her numbers.

(Id.)  She further remarked that her supervisor "allowed someone of his own race to take the exam"

and that that employee was "[t]reated better due to race."  Id.

Second, in her actual EEOC Charge form, Plaintiff again checked only the boxes for "race"

and "retaliation" and identified herself as a "black/hispanic" person, with no reference to her

religion.  Her explanation of her claim stated:

> I was placed on probation for failure to "make my numbers."  Since I was the only
> [employee] in my region to be placed on probation for my numbers, I questioned my
> manager, Audrey Ackaa.  She responded that "This is not about anyone else, just
> me."  I filed a rebuttal to the probation and was again singled out by management.
> My performance was "closely monitored."  I was given deadlines to make my
> numbers or face Termination.  I worked in the branch with Adu Altbergen who is
> white & Russian.  She too was non-consistent with her numbers but was never placed
> on probation.  She was never sent to "cover" other branches.  Each time someone
> was needed in another branch, I was sent.  I also requested hour lunches just as Ada
> had been getting, and was told that I was "being rebellious."  My manager also told
> me that I complained and that I should be "more submissive" to my regional manager
> – Raza Gilani who is Indian.  I was given reports to fax almost on a daily basis and
> was required to meet my investment goals or face termination.
>
> On November 21, 2007, Regional Manager Raza Gilani and Regional Investment
> Manager Emil DeLeo came to the branch in response to an email that I wrote to Raza
> Gilani regarding my concern of unfair treatment (see attached letter to Raza).  In my
> email I explained that I rec[eived] warnings, poor [performance] reviews and
> probation although no one else was making their numbers.  Raza Gilani responded
> that, "This meeting is about you" and also told me that I should not be concerned
> about what any one else is doing.  I also asked him to take a license exam in order to
> advance.  And he told me that my request would only be approved if I made my
> numbers and was removed from probation.  I mentioned that Meena Shah (Indian),
> was allowed to take the test even though she was not making her numbers and had

> not been.  He got visibly upset and again said no to my request for the test.  Emil
> DeLeo also told me that it was not in PNC's best interest to spend money for [the]
> license if I was not making my numbers.  Meena was allowed to study for the test at
> work.

(Def.'s Mot. Summ. J., Ex. B.)

Third, in her Complaint to the PHRC, Plaintiff checked only "race" and "national origin" as

the bases for the discrimination against her.  (Def.'s Mot. Summ. J., Ex. C.)  She went on to

describe the discrimination as follows:

> I was hired by PNC Bank (the "Respondent") in July of 2008.  My national original
> is Trinidadian and my race is Hispanic/Black.  On June 5, 2007 and November 30,
> 2007, branch Manager Audrey Ackaa (not Hispanic/Black or from Trinidad) issued
> to me written warnings after failing to meet my production goals.  On April 25, 2008,
> Respondent terminated my employment due to low productivity.  Other Licensed
> Financial Sales Consultants who have not met their goals have not been disciplined,
> placed on probation, or fired.  They include Magda Eghbal and Meena Shah, among
> others.  Neither Eghbal nor Shah is Hispanic/Black or from Trinidad.  I was also
> denied the opportunity to take additional investment license tests by Regional
> Manager Raza Gilani (not Hispanic/Black or from Trinidad).  I was given no lawful
> non-discriminatory reason for not being permitted to take these tests.  At least one
> other employee (Meena Shah) was permitted to take these tests.  Ms. Shah is not
> Hispanic/Black or from Trinidad.
>
> Because non-Trinidadian employees were treated more favorably that I, I believe that
> I have been discriminated against as set forth above because of my race and national
> origin in violation of Title VII of the Civil Rights Act of 1984 (Title VII).

(Id.)

Lastly, in its December 16, 2009 letter to Plaintiff, the EEOC expressly clarified that its

investigation was limited to Plaintiff's listed allegations of race/national origin discrimination and

retaliation.  For example, the EEOC wrote, "[i]n your charge you alleged that you were written up,

placed on probation and then fired because of your national origin, Trinidadian, and race,

Black/Hispanic."  (Def.'s Mot. Summ. J., Ex. D.)  It went on to remark that, "[n]othing in the

evidence provided suggests that your race or national origin was a factor in the decision to discipline

or discharge you," and that "[f]actors that led to your termination (client age, incompatible products

being offered, staffing shortages) are not related to your race or national origin."  (Id.)

In light of this administrative record, the Court finds that Plaintiff's religious discrimination claim was not fairly within the scope of the prior EEOC complaint or the investigation arising therefrom.  Markedly absent in all of the documentation is any mention of Plaintiff's affiliation with the Jehovah's Witnesses or her involvement with any particular religious practice.  Moreover, nothing in the documents discusses the events which gave rise to the purported religious discrimination, all of which occurred in June to October of 2006.  Quite to the contrary, the entirety of her complaints with the EEOC and the PHRC focus solely on events occurring a year later, in June 2007 to April of 2008.  Accordingly, there is no "close nexus" between the facts supporting the claims raised in the EEOC Charge and those in the Amended Complaint.  Given such allegations and the absence of any indication of discrimination prior to June 2007, the EEOC reasonably limited its investigation to her claims of racial and national origin discrimination and retaliation.  Therefore, the Court cannot reasonably expect, based on the four documents described above, that Defendant had any awareness that allegations of religious discrimination were likely.  Schouten, 58 F. Supp. 2d at 616.  Plaintiff's assertions of religious discrimination are thus not exhausted.

Plaintiff's efforts to prove otherwise are unavailing.  First, Plaintiff places undue reliance on this Court's previous decision in Irizary v. Commonwealth of Pa., Dept. of Transp., No. CIV.A.98-6180, 1999 WL 269917 (E.D. Pa. Apr. 19, 1999).  In that matter, this Court engaged in a brief four-sentence discussion of the exhaustion issue, finding only that the inquiry "must await further factual development of the case, in particular, facts concerning the investigation conducted by the EEOC." Id. at *3.  The Court went on to remark that "[o]n the basis of the pleadings, a determination cannot be made as to whether the scope of the charge doctrine would circumscribe Plaintiff's Title VII claims."  Id.  Unlike in Irizarry, the Court in this case has full access to Plaintiff's administrative filings.  Such documents create a record – not present in Irizarry – on which the Court can determine

14

the basis for Plaintiff's administrative charges and the reasonable scope of the EEOC investigation that ensued.

Second, relying on the Third Circuit decision in Hicks v. ABT Assoc., Inc., 572 F.2d 960, 966 (3d Cir. 1978), Plaintiff contends that Defendant must prove that expanding the scope of the civil action beyond that of the EEOC investigation results in prejudice. This statement of the law, however, is incorrect. In Hicks, the plaintiff raised only race discrimination in his EEOC complaint, but subsequently included sex discrimination in the civil action. Id. at 965. Both claims of discrimination arose out of the same facts and the evidence revealed that the EEOC had failed to contact the plaintiff prior to its investigation to obtain a statement regarding the precise bases for his complaint. Id. at 966. The court found that a question remained as to whether, if a reasonable investigation had occurred, the EEOC would have been informed of the sex discrimination claims. Id. As such, it found that, on the record before it, dismissal based on exhaustion was improper. Id. at 966-67. Ultimately, the court determined that "[a] civil suit will lie even where the EEOC has failed to give defendant notice of the charge or has failed to attempt to reconcile the parties either because of administrative failure or because of its finding of no reasonable cause." Id. at 966. Thereafter, it noted, in *dicta*, that the defendant had "shown no prejudice from expanding the scope of the civil action beyond that of the EEOC investigation." Id. Nonetheless, it reaffirmed the principle that, "[o]nce a charge of some sort is filed with the EEOC, . . . the scope of a resulting private civil action in the district court is 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination . . . .'" Id. (quotations omitted).

In this case, a plain reading of Plaintiff's administrative filings does not indicate that a reasonable investigation of the race discrimination claim would have revealed and encompassed the religious discrimination claim. Contrary to Plaintiff's argument, the religious discrimination claims arose from discrete events occurring from June to October 2006, whereas the events giving rise to

the race/national origin discrimination claims began in June 2007 and continued through her termination in April 2008.[4]  Although, according to Plaintiff, the instances of religious discrimination were the catalysts that caused Defendant to originally bear animus against her, nothing in the administrative documents made any such connection for the EEOC.  Notwithstanding Plaintiff's unfounded expectation otherwise,[5] the EEOC then investigated only the events that resulted in her placement on probation/disciplinary action from June 2007 to April 2008, with no reasonable basis to extend its investigation to events occurring more than a year earlier involving her affiliation with the Jehovah's Witnesses.[6]  As the EEOC investigation that could reasonably be expected to grow out of Plaintiff's charge of discrimination did not encompass the basis for Plaintiff's religious discrimination claims, Defendant bears no additional burden of showing any prejudice from the allowance of such claims.

---

[4]  Notably, Plaintiff's PHRC Charge of Discrimination explicitly states that the earliest date of discrimination occurred on June 5, 2007 and the latest date was on April 25, 2008.  (Def.'s Mot. Summ. J., Ex. C.)

[5]  Plaintiff asserts that "this lawsuit would not even be a lawsuit were it not for the events related to Plaintiff's stated religious preferences and obligations, and Defendant's response to those religious preferences and obligations.  From there, Defendant engaged in subsequent discriminatory and retaliatory acts that form most of the basis of the events alleged in her complaint."  (Pl.'s Resp. Mot. Summ. J. 8-9.)  While this may be the case, Plaintiff bears at least some burden to connect for the EEOC these temporally distant events based on entirely separate facts.

[6]  See Rupert v. PPG Indus., Inc., No. CIV.A.07-705, 2009 WL 596014, at *29 (W.D. Pa. Feb. 26, 2009) ("[T]he determination whether a claim is within the scope of the investigation reasonably expected to grow out of a charge should give weight to the fact that the claim in the charge and the new claim are based upon the same incidents, e.g., the same failure to promote or the same absences from work."); Phillips v. Omnicare Pharm., No. CIV.A.10-0002, 2010 WL 1628784, at *2 (W.D. Pa. Apr. 21, 2010) ("A close nexus must exist between the facts supporting the claim in the complaint and the allegations in the EEOC charge."); Smith-Cook v. Nat'l R.R. Passenger Corp. (AMTRAK), No. CIV.A.05-0880, 2005 WL 3021101, at *4 (E.D. Pa. Nov. 10, 2005) (dismissing claims of retaliation and an ongoing policy of discrimination because plaintiff's charge referred only to "discrete, isolated incidents of discrimination . . . as opposed to allegations of a company wide practice of discrimination").

Finally, Plaintiff asserts, via her Amended Complaint, that when she attended her intake meeting with the EEOC, she specifically advised the officer that "she is a practicing Jehovah's Witness and that unfavorable and discriminatory treatment began after Plaintiff advised Defendant of her religious obligations and refused an invitation to attend a mandatory Halloween costume party."  (Am. Compl. ¶ 11.)  She "also discussed with the EEOC that Defendant asked her to stay late for calling labs on her religious meeting nights when others of a different religion were not asked to do so."  (Id. ¶ 12.)  Moreover, she remarked that, "[t]he facts shared by Plaintiff to the EEOC representative included allegations concerning religious discrimination and her concerns that the alleged adverse employment actions taken against her by Defendant were retaliatory."  (Id. ¶ 13.)  Such facts were allegedly referenced in her "Position Statement to the EEOC."[7]  (Id. ¶ 20.)

The Third Circuit, however, has directly foreclosed Plaintiff's argument.  In Barzanty v. Verizon Pa., supra, the plaintiff asserted that in her answers to the EEOC Intake Questionnaire, she alleged a "hostile work situation," despite never including such a claim in her EEOC complaint.  361 Fed. Appx. at 412-13.  The court rejected her contention that this oral communication satisfied her exhaustion obligation for purposes of her subsequent federal suit.  Id. at 414.  Specifically, it noted that,

> The EEOC Charge Form and the Intake Questionnaire serve different purposes.  An Intake Questionnaire facilitates 'pre-charge filing counseling' and allows the Commission to determine whether it has jurisdiction to pursue a charge. . . . Moreover, the Intake Questionnaire is not shared with the employer during the pendency of the EEOC investigation. On the other hand, an EEOC Charge Form serves to define the scope of the Commission's investigation and to notify the defendant of the charges against it.

Id. at 415.  The court went on to hold that, "[a] plaintiff cannot be allowed to transfer the allegations mentioned only in the questionnaire to the charge itself.  Not only would this be circumventing the

---

[7] Plaintiff has not provided a copy of this statement.

role of the Commission, but it would be prejudicial to the employer." Id. (citing Park v. Howard

Univ., 71 F.3d 904, 909 (D.C. Cir. 1995) ("To treat Intake Questionnaires willy-nilly as charges

would be to dispense with the requirement of notification of the prospective defendant . . . ."))[8]

Accordingly, any of Plaintiff's oral claims or casual references in ancillary paperwork regarding the

alleged religious discrimination do not suffice to have given notice of such claims to Defendant and

cannot be used to exhaust Plaintiff's administrative remedies.

In sum, the Court finds that Plaintiff has not put forth any plausible argument that she

exhausted her administrative remedies as to her religious discrimination claim.  The administrative

documents of record clearly show that Plaintiff checked off only race discrimination and retaliation,

and then set forth only facts to establish such racial discrimination and retaliation.  The facts

underlying Plaintiff's religious discrimination claim, as described in her federal complaint, are not

only wholly distinct from those giving rise to her race discrimination claim, but are so temporally

removed from the latter facts as to be not within the scope of any reasonable EEOC investigation.  If

the religious discrimination claims were really, as Plaintiff now asserts, "the essence of her claims . .

. that PNC discriminated against her and retaliat[ed] against her once she expressed her religious

---

[8]  See also Ventura v. Montclair State Univ., No. CIV.A.08-5792, 2011 WL 550720, at *7
(D.N.J. Feb. 9, 2011) ("The law is clear that when contemplating the scope of the subsequent law
suit it is only the claims made in the formal charge that may be considered and not allegations
made in ancillary paperwork."); Kellam v. Indep. Charter Sch., 735 F. Supp. 2d 248, 253 (E.D.
Pa. 2010) ("If a claim is initially mentioned in the charge questionnaire but is not included in the
formal charge, then this claim is not exhausted.  Indeed, to allow a plaintiff to initially raise a
claim with a Charge Questionnaire and then abandon it in his formal charge only to reassert that
claim in federal court would completely subvert the exhaustion requirement."); Binder v. PPL
Servs. Corp., No. CIV.A.06-2877, 2009 WL 3738569, at *6 (E.D. Pa. Nov. 5, 2009) ("Courts in
this Circuit have uniformly held that intake questionnaires do not serve the same function as the
formal charge, are not part of the formal charge, and therefore do not satisfy the exhaustion
requirement in circumstances where a claim marked off in the questionnaire is omitted from the
charge and where the EEOC or other state administrative commission does not investigate the
omitted claim.").

affiliation as a practicing Jehovah's [W]itness," (Pl.'s Resp. Mot. Summ. J. 10), reason suggests that she would have made at least cursory mention of such claims in either her EEOC Intake Form, EEOC Complaint, or PHRC Complaint.  She did not do so and is thus barred from raising them here.

      **B.**    **Retaliation**

     Defendant also seeks dismissal of Plaintiff's retaliation claim on grounds of exhaustion. Specifically, in her Amended Complaint, Plaintiff alleged that she engaged in activity protected by Title VII and, as a result, Defendant took adverse employment action against her, including Disciplines, denials of various opportunities, and termination.  (Am. Compl. ¶¶ 126-27.)  Defendant argues, however, that in Plaintiff's EEOC Intake Questionnaire and EEOC Charge form, she simply checked off the form for retaliation, without setting forth any facts to support such a charge.  On this issue, this Court disagrees with Defendant and finds the retaliation claim to be exhausted.

     As a preliminary matter, it is well-established that merely checking off the box on the Charge form is insufficient to exhaust it as a claim.  McCutchen v. Sunoco, Inc., No. CIV.A.01-2788, 2002 WL 1896586, at *3 (E.D. Pa. Aug. 16, 2002).  Rather, a plaintiff that checks off a box for a particular type of discrimination on a Charge form, but then leaves the form bereft of any allusion to allegations of such discrimination cannot be deemed to have exhausted that claim.  Id. Likewise, in the Third Circuit, there is no per se rule that all claims of retaliation are ancillary to the filing of an EEOC Charge, thus requiring the Court to closely scrutinize the record to determine whether retaliation falls within the scope of the actual EEOC investigation.  Pourkay, 2009 WL 1795814, at *6 (citing Robinson v. Dalton, 107 F.3d 1018, 1024 (3d Cir. 1996)).

     Where, however, the Charge form contains allegations supportive of a retaliation claim, such a claim will be deemed to be within the scope of the Charge.  The elements of a retaliation claim include:  (1) conduct protected by Title VII taken by the plaintiff; (2) adverse employment action

against the plaintiff by the employer; and (3) a causal link between the protected conduct and the employer's adverse action.  Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 200 (3d Cir. 1994). "An acceptable form of protected activity under Title VII are informal protests of discriminatory employment practices, including making complaints to management."  Hartman v. Sterling, Inc., No. CIV.A.01-2630, 2003 WL 22358548, at *8 (E.D. Pa. Sept. 10, 2003).  Where the facts underlying the properly alleged discrimination claims are closely connected to the facts underlying the retaliation claims, courts have deemed the retaliation claims fairly within the scope of an EEOC investigation, notwithstanding the failure to clearly enumerate the basis for such a claim.  See, e.g., Demshick v. Delaware Valley Convalescent Homes, Inc., No. CIV.A.05-2251, 2007 WL 1244440, at *12 (E.D. Pa. Apr. 26, 2007) (allowing a retaliation claim to withstand summary judgment despite the plaintiff having checked only "disability" and not "retaliation" as the cause for discrimination on her EEOC charge form, because "a plain reading" of the plaintiff's narrative revealed a claim for retaliation as well); Jackson v. J. Lewis Crozer Library, No. CIV.A.07-481, 2007 WL 2407102, at *4 (E.D. Pa. Aug. 22, 2007) (holding that while the complaint does not use the word "retaliation," the actions alleged by plaintiff were within the scope of a claim for retaliation and would have been within the scope of any investigation conducted by the PHRC as a result of the PHRC complaint);  Hartwell v. Lifetime Doors, Inc., No. CIV.A.05-2115, 2006 WL 381685, at *18 (E.D. Pa. Feb. 16, 2006) (noting that although plaintiff could have been more "artful" in the presentation of his retaliation claim, although plaintiff emphasized race and disability discrimination, and although the EEOC conducted no investigation with respect to any claim of retaliation, the description of his race and disability discrimination claim indicating that he was fired a single day after filing a discrimination charge should have been sufficient to alert the EEOC to a potential retaliation claim); Carter v. Potter, No. CIV.A.02-7326, 2004 WL 2958428, at *6 (E.D. Pa. Dec. 21, 2004) (holding that an EEOC complaint that alleged race, disability, and age discrimination

reasonably encompassed retaliation claim where the facts of the retaliation were virtually identical to the facts underlying the discrimination claims).

In this case, Plaintiff's retaliation claims are fairly within the scope of the EEOC Charge of Discrimination.  First and foremost, Plaintiff checked the box for retaliation, thereby putting both the EEOC and Defendant on notice of a potential claim.  Second, in her statement of facts supporting the EEOC Charge, Plaintiff made numerous references to informal protests of discriminatory employment practices, which, as noted above, constitute an acceptable form of protected activity under Title VII.  Hartman, 2003 WL 22358548, at *8.  In particular, she alleged that: (a) "[she] sent [her] regional manager an email and filed a rebuttal for probation.  Shortly thereafter [she] was placed on probation and singled-out for not 'making [her] numbers;'" (b) when she requested equal treatment to other similarly situated employees, she was told that she was "being rebellious" and needed to be "more submissive" to her regional manager; and (c) she sent an email to her regional manager regarding her "concern of unfair treatment" and was told that she should not be concerned with anyone else.  (Def.'s Mot. Summ. J., Ex. B.)  Third and finally, the EEOC investigation clearly encompassed the retaliation claim, as the December 16, 2009 letter stated that: "[i]n all of your communications with [Defendant] following various disciplinary actions, you did not raise concerns that your race and/or your national origin were factors in your treatment that impacted your performance.  This is likely because you had no evidence that this was the case."  (Def.'s Mot. Summ. J., Ex. D.)  The failure of the EEOC investigation to uncover any such evidence of retaliation has no bearing on the fact that the retaliation claim was actually considered by the EEOC.  Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984) (noting that "[t]he failure of the EEOC investigation to uncover any such evidence of retaliation is irrelevant to the fact that the retaliation claim was indeed before the EEOC").

Accordingly, the Court deems Plaintiff's retaliation claim to have been properly exhausted before the EEOC and, thus, appropriately included in her federal Complaint.

## IV.     CONCLUSION

For the foregoing reasons, the Court grants Defendant's Motion in part and denies it in part. As to Plaintiff's allegation of religious discrimination, the Court finds that it was not fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom.  Plaintiff never mentioned her religion, never indicated that she suffered discrimination based on religion, and failed to discuss any of the discrete and temporally distant facts on which her allegation of religious discrimination was based.  As to her retaliation claim, however, the Court finds a close nexus between the facts giving rise to both that claim and her properly exhausted claim of racial discrimination.  Indeed, Plaintiff's EEOC claim clearly set forth allegations of engaging in a protected activity and being "singled out" as a result – facts explicitly investigated by the EEOC. Therefore, the Court will grant Defendant's Motion to Dismiss the religious discrimination claim (Count II of the Amended Complaint) and deny Defendant's Motion to Dismiss the retaliation claim (Count IV of the Amended Complaint).

An appropriate Order follows.