**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DENYSE H. MORALES, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.  10-1368 |
| PNC BANK, N.A., | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                                                October 3, 2012

Currently pending before the Court is Defendant PNC Bank, N.A.'s Motion for Summary

Judgment.  For the following reasons, the Motion is granted.

**I.       FACTUAL AND PROCEDURAL BACKGROUND**

This matter involves an employment discrimination dispute between Plaintiff Denyse

Morales ("Morales") and Defendant PNC Bank ("PNC").  Ms. Morales is a forty-five year old,

Hispanic/African-American female from Trinidad and a practicing Jehovah's Witness.  (Am.

Compl. ¶ 1.)   PNC hired Ms. Morales on July 10, 2006 as a Licensed Financial Sales Consultant

("LFSC") in its Rydal branch office.  (Id. ¶ 9.)  She was interviewed and hired by Audrey Ackaa

("Ackaa"), the Branch Manager of the Rydal Branch.  (Id. ¶ 38.)   Ms. Ackaa is African-

American, and her mother is of Spanish and Jamaican descent.  (Def.'s Mot. Summ. J., Ex. 2,

Dep. of Audrey Ackaa ("Ackaa Dep."), 196:17–197:6, May 23, 2012.)  The Rydal Branch was,

in turn, supervised by Regional Manager Raza Gilani, who oversaw fifteen branches in the

Philadelphia Metro Region.  (Def.'s Mot. Summ J., Ex. 3, Dep. of Raza Gilani ("Gilani Dep."),
6:19–7:9, May 23, 2012.)  In addition to Ms. Morales, there were five other LFSC's within the
region who Mr. Gilani oversaw.  (Gilani Dep.17.)  Mr. Gilani is of Pakistani origin and is a
Muslim.  (Am. Compl. ¶ 38; Answer ¶ 38; Def.'s St. of Undisputed Facts ¶ 36; Pl.'s Resp. to
Def.'s St. of Undisputed Facts ¶ 36.)

As an LFSC, Ms. Morales's job duties included selling certain investment and traditional
banking products to PNC's customers, including checking accounts, savings accounts, credit
cards, and loans.  (Def.'s Mot. Summ. J., Ex. 1, Dep. of  Denyse Morales ("Morales Dep."),
18–19, 21, Apr. 4, 2012.)  She possessed a number of licenses, including Series 6 and 63 licenses
from the National Association of Securities Dealers.  (Id. at 18–19.)   These licenses allowed her
to sell certain types of PNC banking products.  (Id.)  Her job responsibilities also included
meeting with customers and participating in "call nights," at which employees contacted
potential customers by telephone in order to generate sales.  (Id. at 18, 23; Ackaa Dep. 66.)
Additionally, Ms. Morales was required to profile and refer customers to Scott Troilo, the
Financial Consultant in the Rydal Branch, when customers were either interested in instruments
she was not licensed to sell or potential investments over $100,000.  (Morales Dep. 17:5–17,
21:18–22:3; Def.s' Mot. Summ. J., Ex. 4, Decl. of Scott Troilo ("Troilo Decl."), ¶ 5.)  As an
LFSC, Ms. Morales was required to meet minimum monthly production goals.  (Morales Dep.
24:15–25:22.)

Starting during her first month of employment, Ms. Morales did not meet her minimum
revenue goals.  (Am. Compl. ¶ 40; Ans. ¶ 40.)  This trend continued throughout her employment
at PNC.  (Morales Dep. 132:13–133:1, 213:24–215:5.)  In three of the first five months of 2007,

2

she did not meet her minimum revenue requirements of 60,000 minimum revenue credits. (Morales Dep. 202:3–16.)  After this failure, Ms. Ackaa furnished Ms. Morales with a verbal warning for her sales performance and provided her with specific steps to improve her investment sales results.  (Morales Dep. 28:1–14, 31:2–6, 205:9–16; Ackaa Dep. 185:5–186:2.) Following this warning, Ms. Morales began to be transferred to different branches in addition to her work in the Rydal branch.  (Def.'s St. of Undisputed Facts ¶ 17–18; Pl.'s Resp. to Def.'s St. of Undisputed Facts ¶ 17–18.)  PNC alleges that these transfers were designed to increase the number of customer referrals she received and to help her meet her revenue goals.  (Gilani Dep. 11:14–12:14, 93:5–95:1; Ackaa Dep. 202:14–203:4.)  Morales claims the transfers were to "low opportunity" branches, and they made it difficult for her to create stability with her clients.  (Pl.'s Resp. to Def.'s St. of Undisputed Facts ¶ 17–18.)

Ms. Morales' numbers continued to fall "well short" of the goals set for her, as she failed to meet her monthly investment production goal of $1,000 in each month from January to October, 2007 and failed to meet her revenue credit production goal of 60,000 in seven of those ten months.  (Morales Dep. 214:9–216:13.)  Mr. Troilo also communicated to PNC management that Morales's performance was below expectations and that she was not referring a sufficient number of customers to him.  (Troilo Decl. ¶ 6.)  Ms. Morales contends that she was referring sufficient customers to Mr. Troilo, but he failed to update the referrals assigned to him and she did not receive proper credit.  (Pl.'s Resp. to Def.'s St. of Undisputed Facts, Ex. H, Morales Affidavit ("Morales Aff."), ¶ 12.)  In October, Ms. Ackaa rated Morales' performance as "marginally achieves," which disqualified her from receiving incentive pay under PNC's policy. (Def.'s Mot. Summ. J., Ex. 5, Decl. of Audrey Ackaa ("Ackaa Decl."), ¶ 6.)

In January 2008, after a December in which Ms. Morales's numbers were again short of her monthly goal, Ms. Ackaa placed her on a ninety-day probation period.  (Ackaa Dep. 64:5–22, 187:2–15.)  The written notice of probation informed Morales that failure to meet the expectations outlined in the notice could lead to further corrective action, including termination. (Id. at Ex. 14.)   During the probationary period, Ms. Morales again failed to meet her monthly investment revenue goals and did not have any referrals that resulted in closed sales.  (Morales Dep. 33:5–19, 229:15–230:18.)  As a result, on April 28, 2008, Ms. Ackaa informed Morales that she had conferred with Mr. Gilani and the Human Resources Department and that PNC decided to discharge her due to her poor performance.  (Morales Dep. 33:20–24; Ackaa Decl. ¶¶ 9–10.)

Ms. Morales does not dispute that her numbers were below the minimum goals set for her during her employment.  Rather, she claims that similarly situated employees also failed to meet their revenue production goals but were not placed on probation or terminated.  Ms. Morales cites three specific employees in particular: Ada Altbregen, Meena Shah, and Magda Eghbal. (Def.'s Statement of Undisputed Facts ¶¶ 52, 70, 86; Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶¶ 15, 29, 52, 70, 86.)

Ada Altbregen was a Financial Sales Consultant (FSC) at the Rydal branch.  (Morales Dep. 104:3–20; Ackaa Dep. 41:4–14.)  Unlike an LFSC, FSC's are unlicensed and cannot sell investments to customers and, as a result, do not have monthly production requirements or goals with regards to investments.  (Id.)  FSC's were required to refer potential investment sales to an LFSC or a company broker.  (Ackaa Dep. 40:6–18.)  Ms. Morales claims that Ms. Altbregen was favored by Ms. Ackaa because Ackaa would open accounts for Altbregen instead of Morales, give Altbregen extra time off for lunch, ignore policy violations or customer complaints about

4

Altbregen, and approve vacation time for Altbregen over Morales.  (Morales Dep. 96:9–11, 100:17–21, 140:2–4, 174:22–175:16, 232:21–22, 244:2–8.)  Ms. Altbregen was Jewish and was given time off for Jewish holidays.  (Pl.'s Resp. to Def.'s St. of Undisputed Facts, Ex. D, Dep. of Sharon Purcell ("Purcell Dep."), 121:1–7, Jun. 6, 2012.)   Ms. Morales contends that she outperformed Ms. Altbregen, but Ms. Altbregen was not required to call in or e-mail Mr. Gilani to update him on her daily activities, attend call nights, or cover other branches in the region.  (Morales Dep. 100:17–21, 140:2–4, 244:7–8.)  Ms. Altbregen was later discharged in August 2010 for a policy violation.  (Ackaa Dep. 19:1–9.)  Sharon Purcell, another employee in the Rydal Branch, also felt that Ms. Ackaa favored Ms. Altbregen compared to the other employees in the branch.  (Purcell Dep. 101:11–16, 113:14–114:12, 121:8–15.)  Ms. Purcell did not attribute the favoritism to race, religion, or national origin.  (Purcell Dep. 34:5-7, 89:12–90:3.)  Like Ms. Morales, Ms. Purcell was African-American and a practicing Jehovah's Witness.  She worked at PNC for ten months, from July 10, 2006 through May 11, 2007.  (Purcell Dep. 36:5–18.)  She did not work at PNC during the last eleven months of Morales' employment.  (Id.)

Meena Shah and Magda Eghbal were both LFSC's like Morales, though at other branches in the region.  (Def.'s St. of Undisputed Facts ¶ 66; Pl.'s. Resp. to Def.'s St. of Undisputed Facts ¶ 66.)  Ms. Morales claims that Ms. Shah and Ms. Eghbal did not consistently meet their monthly revenue goals but were not placed on probation or terminated.[1]  (Def.'s St. of Undisputed Facts ¶ 66, 67; Pl.'s Resp. to Def.'s St. of Undisputed Facts ¶ 66, 67, 70, 78.)  To support her claim, Ms. Morales notes that Ms. Shah also failed to meet the minimum revenue requirements in three of

---

[1]Mr. Gilani stated in his deposition that one other unspecified LFSC was terminated during the time period relevant to this case for failing to meet their revenue investment goals. Ms. Morales denies this fact.

the first five months of 2007, after which she was not disciplined.  (Pl.'s Resp. to Def.'s St. of

Undisputed Facts ¶ 15.)  Similarly, Ms. Morales claims that Ms. Shah did not reach her

investment requirement in three of the first four months in 2008—the period during which

Morales was on probation.  (Id. at ¶ 29.)  Morales claims that Ms. Eghbal failed to meet her goal

for two of the four months in the same period.[2]  (Id.)  Ms. Shah is of Pakistani descent, as is Mr.

Gilani.[3]   (Def.'s Resp. to Pl.'s Supp. Facts ¶ 2.)  PNC states that both Shah and Eghbal met their

monthly revenue and investment goals more consistently than Morales.  (Ackaa Decl. ¶ 8, Exs.

B, C.; DeFeo Decl. ¶ 5, Ex. A.)

Ms. Morales believes that the disciplinary action taken against her and her eventual

termination were in retaliation to her refusal to attend a "mandatory" employee Halloween party

on October 31, 2006, which conflicted with her religious beliefs as a Jehovah's Witness.

(Morales Dep. 97:2–15, 121:18–124:6; Aacka Dep. 77:1–15.)  After informing her managers that

she was not planning on attending, Mr. Gilani told Morales that the party was an employee

appreciation party, not a religious event, and that she did not have to attend in costume.  (Morales

Dep. 125:2–126:6.)  Ms. Morales claims that Mr. Gilani told her that attendance at the party was

mandatory because PNC had spent a lot of money on the event.  (Morales Dep. 123:11–124:6.)

---

[2] Morales also claims that the calculations used by PNC in comparing Morales to Eghbal and Shah are not based solely on actual sales but also "account referrals," which do not take into consideration sales actually consummated.  (Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 70 n.3, 78.)  Morales claims that her numbers based on actual sales are higher than those of Eghbal and Shah.  (Id.)

[3] Ms. Morales also claims that Ms. Eghbal is also of Pakistani descent, which Defendant denies.  (Pl.'s Supp. Facts ¶ 2; Def.'s Resp. to Pl.'s Supp. Facts ¶ 2.)  Additionally, Ms. Morales implies in her Response to Defendant's Motion for Summary Judgment that one or both of Ms. Shah and Ms. Eghbal are Muslim, as is Mr. Gilani.  However, there is no evidence in the record of the religious beliefs of either Shah or Eghbal.

Morales claims that, before the party, she was in good standing with PNC and was lauded by both Ms. Ackaa and Mr. Gilani.  (Pl.'s Supp. Facts ¶ 6)  However, after her refusal to attend the party, she alleges that she was targeted by Ms. Ackaa and Mr. Gilani in an effort to "conjure" up disciplinary actions and reasons to support her eventual termination.  (Morales Dep. 98:10–99:10, 122:22–123:7, 126:10–127:14.)  She believes that her refusal to attend the party led to her being required to check in with Mr. Gilani at the end of each day, to her being required to attend performance counseling, and to her eventual termination.  (Morales Dep. 122:16–123:7, 126:10–127:14.)  PNC claims that out of an invited one-hundred and seventy-five employees in the region attended the party, only approximately seventy attended.  (Defs. St. of Undisputed Facts ¶ 39.)  Ms. Morales responds by stating that the party was not intended for all employees in the region, but only those in close proximity to the venue (which itself was not capable of accommodating one-hundred and seventy-five persons).  (Pl.'s Resp. to Def.'s St. of Undisputed Facts ¶ 39.)  No employee in the region, including Morales, received any counseling or disciplinary action for not attending the party.  (Defs. St. of Undisputed Facts ¶ 40; Pl.'s Resp. to Def.'s St. of Undisputed Facts ¶ 40.)

Aside from her refusal to attend the Halloween party, Ms. Morales also filed other complaints against PNC during her time there.  She called PNC's Employee Relations Information Center ("ERIC") hotline to lodge complaints.  Ms. Morales called the hotline once during her employment, on or around April 4, 2007, and allegedly raised two issues: (1) that she was not being paid commissions after being placed on probation[4], and (2) that Ms. Altbregen had

_____

[4]Ms. Morales' claims that she called the ERIC hotline in April of 2007 to complain about being placed on probation; however, she was not actually placed on probation until January of 2008.  (Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 45; Ackaa Dep. 64:5–22,

special lunch privileges in the Rydal Branch.  Ms. Morales did not state in her call that she felt she was the target of discriminated or retaliation.  (Morales Dep. 157:19–158:5, 163:21–164:10; Pl.'s Resp. to Def.'s Statement of Undisputed Facts, Ex. I, ERIC Call Log.)  She claims this was done because she did not feel comfortable lodging complaints about discrimination or retaliation. (Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 45.)

Additionally, Ms. Morales submitted a written "rebuttal" and sent an e-mail to Mr. Gilani in November of 2007 as responses to formal warnings for failing to meet her revenue goals. (Morales Dep., Exs. 19, 21.)  In these written rebuttals, Ms. Morales protested that the expectations for her were too high, that her production suffered because she was required to cover other branches, and that the products she was permitted to offer were unsuitable for elderly customers in the Rydal branch.  (Id.)  She also requested the opportunity to study for a Series 65 Examination, which would have provided her with an additional license by which she could sell additional products.  (Id., Am. Compl. ¶ 81; Answer ¶ 81.)  Ms. Morales claimed that the license would allow her the opportunity to offer a wider and more appropriate array of investment alternatives to the customer base at the Rydal Branch.  (Am. Compl. ¶ 81; Resp. to Am. Compl. ¶ 81.)  In her letters, she did not mention her race, national origin, religion, decision not to attend the employee recognition party, or any other claim that she was subjected to discrimination or retaliation.  (Morales Dep., Exs. 19, 21.)  Ms. Morales complained to Mr. Gilani and Ms. Ackaa that other LFSC's in the region were not meeting their minimum production members but was told in response to not worry about anyone but herself.  (Morales Dep. 129:14–130:5.)  Ms. Morales also told Ms. Ackaa that she was going to sue PNC for failing to pay her incentive, or

_____

187:2–15.)

for discrimination, and that no other employees were succeeding in making their production numbers on a regular basis. (Ackaa Dep. 163:13–165:20, 174:3–14, Ex. 10.)

On June 2, 2008, acting *pro se,* Ms. Morales filed a Charge of Discrimination with the Equal Omployment Opportunity Commission ("EEOC") and requested her charge be dual-filed with the Pennsylvania Human Relations Commission ("PHRC") in accordance with the Pennsylvania Human Relations Act ("PHRA"). On December 29, 2009, the EEOC issued her a "Dismissal and Notice of Rights" ("Right to Sue letter"), finding no evidence of discrimination. On March 29, 2010, Morales filed the current action in federal court setting forth five counts for relief: (1) race discrimination under the Title VII of the Civil Rights Act of 1964 ("Title VII"), (2) religious discrimination under Title VII; (3) national origin discrimination under Title VII; (4) retaliation under Title VII; and (5) violation of the Pennsylvania Human Relations Act. Defendant PNC filed a Motion to Dismiss the religious discrimination and retaliation claims on March 17, 2011. This Court granted Defendant's Motion to Dismiss the religious discrimination claims but denied it as to the retaliation claim. Defendant then filed the current Motion for Summary Judgment on June 18, 2012. Plaintiff responded in opposition on August 6, 2012.

## II.   STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex,

477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant

will not be adequate to support a denial of a motion for summary judgment; there must be

enough evidence to enable a jury to reasonably find for the non-movant on that issue.  Anderson,

477 U.S. at 249–50.

## III.    DISCUSSION

PNC moves for summary judgment on four counts.  It seeks summary judgment on

Morales's discrimination claims on the basis of race and national origin (Counts I, III, and V[5]) by

arguing that Morales has failed to make a *prima facie* case under the McDonnell Douglas burden

shifting framework.  Alternatively, PNC argues these counts should be dismissed because

Morales cannot demonstrate that PNC's legitimate nondiscriminatory reason for firing her (her

failure to meet her revenue goals) was pretextual.  PNC also seeks dismissal of Morales'

retaliation claim (Count IV) by alleging that (1) Morales cannot bring a retaliation claim for

religious discrimination because she failed to exhaust her administrative remedies, and (2)

Morales cannot bring a retaliation claim for race or national origin discrimination because she

cannot show either that she participated in a protected activity or, alternatively, that there is a

causal connection between her termination and her race or national origin.

### A.    Morales' Race and National Origin Claims

Title VII makes it unlawful for an employer "to discriminate against any individual with

---

[5]  Claim V is brought under the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 et seq.  The same standards and tests apply to cases arising under Title VII and the PHRA. Washco v. Fed. Express Corp., 402 F. Supp. 2d 547, 554 (E.D. Pa. 2005).  Accordingly, Morales's Title VII and PHRA claims will be treated under one analysis below.

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "To

succeed on a Title VII or § 1981 claim of race discrimination, a claimant must establish that he

was the subject of purposeful discrimination."  Robinson v. Home Depot, Inc., No. Civ.A.06-

935, 2009 WL 2960990, at *15 (D.N.J. Sept. 11, 2009) (citing Weldon v. Kraft, 896 F.2d 793,

796 (3d Cir. 1990)).  Where, as here, the plaintiff does not present direct evidence of

discrimination, courts apply the burden-shifting framework established by the Supreme Court in

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Jones v. Sch. Dist. of Phila., 198

F.3d 403, 410 (3d Cir. 1999) (citing McDonnell Douglas, 411 U.S. at 802).  Under the

McDonnell Douglas scheme, plaintiffs alleging race or national origin based employment

discrimination must first establish a prima facie case by showing: (1) they are members of a

protected class; (2) they are qualified for the position; (3) they suffered an adverse employment

action; and (4) that the action occurred under circumstances that give rise to an inference of

unlawful discrimination, such as when a similarly-situated person not of the protected class is

treated differently.  Id. at 410–11.

    If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the

defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action.

Id. at 410.  The burden on the defendant at this juncture is "relatively light," and the defendant

can satisfy it "by introducing evidence which, taken as true, would permit the conclusion that

there was a non-discriminatory reason for the unfavorable employment decision."  Fuentes v.

Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  "The employer need not prove that the tendered reason

*actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden

of proving intentional discrimination always rests with the plaintiff." Id.  Once the defendant articulates such reasons, the burden reverts back to plaintiff, who must show by a preponderance of the evidence that those legitimate reasons were a pretext for discrimination.  Id.  In order to defeat a summary judgment motion, the plaintiff must produce evidence which would allow a factfinder "reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."  Id. (internal citations omitted); see also Robinson v. Matthews Int'l. Corp., No. Civ.A.09-1965, 2010 WL 763869, at *3 (3d Cir. Mar. 8, 2010). Notably, "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion." Weldon v. Kraft, Inc., 896 F.2d 793, 800 (3d Cir. 1990).  Indeed, because discriminatory conduct is often subtle and difficult to prove, a plaintiff may rely on circumstantial evidence to establish both racial animus and pretext.  Id.  Where the issue of pretext turns on the credibility of the competing testimony, a request for summary judgment must be denied.  Id.

Defendant challenges the fourth element of the prima facie case for both race and national origin discrimination.  Specifically, it states that Ms. Morales cannot demonstrate that her discipline and eventual termination occurred under circumstances which give rise to an inference of unlawful discrimination.  For support, they note that Ms. Morales never stated during her employment that she felt discriminated against on the basis of race or national origin by Ackaa, Gilani, or anyone else at PNC.  PNC also notes that Ackaa, who was the primary decision maker in Morales's discharge, is also African-American and of Spanish descent.  Additionally, Ackaa's mother is from a Caribbean island (Jamaica) while Morales is from Trinidad.  See Dungee v. Ne.

13

Foods, Inc. 940 F. Supp. 682, 688 n.3 (D.N.J. 1996) (noting that a decision maker of the same class as the plaintiff's protected class weakens any possible inference of discrimination). Alternatively, assuming *arguendo* that Plaintiff meets the prima facie case, defendants claim that Morales cannot demonstrate that their legitimate proffered reason for terminating her (that she failed to consistently meet her production goals) was pretextual.

Morales responds that she meets the fourth element because there were similarly situated employees outside of her protected class(es) who were treated more favorably than she. Similarly, she claims that the treatment of these employees is also evidence that PNC's proffered legitimate reason for her termination was pretextual.  As evidence, Ms. Morales cites three specific employees: Ms. Altbregen, Ms. Shah, and Ms. Eghbal.  The Court finds that none of these individuals are similarly situated, thus precluding Plaintiff from establishing her *prima facie* case.

Ms. Altbregen is not a sufficient comparator and, in any event, even if Altbregen was treated better than Morales the evidence in the record suggests she was treated better than *all* employees at the Rydal branch.  For fellow employees to be considered similarly situated under Title VII, they must "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." McCormick v. Allegheny Valley Sch., No.Civ.A.06-3332, 2008 WL 355617, at *11 (E.D. Pa. Feb. 6, 2008) (citing Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D. Pa. 1994). Examples of relevant comparison factors include dealing with the same supervisor, having been subject to the same standards, and engaging in the same conduct without differentiating or mitigating circumstances. Id. (citing Mack v. Strauss, 134 F. Supp. 2d 103, 114 (D.D.C. 2001)).

14

Even though Altbregen and Morales both reported to Ackaa as their supervisor, Altbregen was not licensed to sell investments and, as a result, did not have a minimum investment goal to reach every month.  Altbregen could only refer potential investment sales to either Morales or a broker at the branch.  Most importantly, both Sharon Purcell (upon whose deposition Morales relies) and Morales herself admit that Altbregen was favored over all employees in the Rydal branch by Ackaa.  Moreover, Purcell states that she felt this favoritism had nothing to do with race or religion.  Even if Altbregen was treated more favorably than Morales, she was treated more favorably than every employee at the Rydal branch regardless of race or national origin.

Similarly, Meena Shah and Magda Eghbal are not similarly situated.  Ms. Shah and Ms. Eghbal consistently outperformed Ms. Morales in the minimum goals set for her by PNC.  As such, Morales is unable to demonstrate that Shah or Eghbal were treated more favorably as a result of race or national origin.  Eghbal outperformed Morales for twelve of the sixteen months between January 2007 and April 2008 in investment revenue production.  Similarly, Shah outperformed Morales in investment sales ($7,881 to $4,718) and in monthly average revenue credit production (66,052 to 52,577) from January 2007 to April 2008.  Unlike Morales, Shah was sponsored by PNC to take the Series 7 and 65 examinations.  This sponsorship was given in order to entice her to stay once she informed PNC that she intended to leave for one of their competitors.

In a last effort to demonstrate that these other employees were similarly situated, Morales claims that PNC's evaluation methods place her in a poor light and that she actually outperformed Eghbal and Shah.  Plaintiff claims that PNC's evaluation method takes into account both actual sales numbers and account referral credits, even though account referrals do

not necessarily lead to actual sales.  (Pl.'s Resp. to Def.'s St. of Undisputed Facts ¶¶ 70, 78–80, 84, 85.)  Plaintiff further contends that if PNC considers actual sales numbers, she performed better than Shah and Eghbal.  (Id. at ¶ 70, 80.)

It is not this Court's role, however, to reassess PNC's decision making process with regards to its employees.  "Where an employer produces evidence that the plaintiff was [subject to an adverse employment action] because of its view that the plaintiff lacked a particular qualification the employer deemed essential to the position sought, a district court should focus on the qualification the employer found lacking in determining whether non-members of the protected class were treated more favorably."  Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 528 (3d Cir. Pa. 1992).  The district court may not act as a member of an employer's board or committee.  Id.  As such, because Shah outperformed Morales using PNC's stated evaluation methods, and because Morales has not demonstrated that these methods were used in a way to purposely target her in a discriminatory fashion, plaintiff cannot show that Shah or Eghbal were treated more favorably than she was on the basis of race or national origin.

Therefore, it is the opinion of the Court that Plaintiff fails to meet the fourth element of the prima facie case, namely that the adverse employment suffered by Morales was not done under circumstances giving rise to an inference of unlawful discrimination.  In turn, Defendant's Motion for Summary Judgment on the discrimination claims is granted.

### B.  Morales's Retaliation Claim

Courts examining retaliation claims utilize another McDonnell Douglas burden-shifting approach, in which the prima facie case entails proof of three elements: "(1) [Plaintiff] engaged

16

in activity protected by Title VII; (2) the employer took an adverse employment action against [her]; and (3) there was a causal connection between [her] participation in the protected activity and the adverse employment action." Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006) (applying the McDonnell Douglas framework in retaliation case) (citation omitted); see also Hare v. Potter, 220 F. App'x. 120, 127 (3d Cir. 2007).

Title VII recognizes two distinct types of protected activity.  It is unlawful for an employer to discriminate against an employee  who either "[1] . . . has opposed any practice made an unlawful employment practice by this subchapter, [Opposition Conduct] or (2) has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [Participation Conduct]." 42 U.S.C. § 2000e-3(a). "The opposition clause prohibits retaliation because the employee 'opposed any practice made an unlawful employment practice by [Title VII.].'" Campbell v. Abercrombie & Fitch, Co., No.Civ.A.03-3159, 2005 WL 1387645, at *5 (D.N.J. June 9, 2005) (citing Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 896 n.4 (3d Cir. 1993)).  The participation clause prohibits retaliation because an employee made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.  Campbell, 2005 U.S. Dist. LEXIS 11507 at *13–14.

Under the second element, an adverse employment action is one that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Moore v. City of Phila., 461 F.3d 331, 341 (3d Cir. Pa. 2006) (internal citation omitted).  Finally, a plaintiff must show a causal connection between the plaintiff's opposition to, or participation in

17

proceedings against, unlawful discrimination and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  This third element "identif[ies] what harassment, if any, a reasonable jury could link to a retaliatory animus." Jensen v. Potter, 435 F.3d 444, 449–50 (3d Cir. 2006).

Once a plaintiff has made her prima facie case, the burden then shifts to the defendant to offer a legitimate non-discriminatory reason for the adverse employment action.  Fuentes, 32 F.3d at 763.  If a defendant has offered a legitimate non-discriminatory reason for the adverse employment action, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action." Id. at 764 (internal quotations and citations omitted).  As such, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies,  or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Id. at 765 (internal quotations, citations, and emphasis omitted).  Unlike in discrimination claims, the Third Circuit has noted that the scope of a retaliation claim may extend beyond actions "that affect the terms and conditions of employment." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62, (2006).

With retaliation claims, the "ultimate question . . . is an intent to retaliate *vel non*." Jensen, 435 F.3d at 449 n.2.  To help in this analysis, courts have looked at the temporal proximity between a plaintiff's protected activity and the employer's purportedly retaliatory response, and events in the intervening period.  Marra v. Phila. Hous. Auth., 497 F.3d 286, 302

18

(3d Cir. 2007).  The absence of temporal proximity is not sufficient to overcome a claim of

retaliation.  Rather, "[t]he mere passage of time is not legally conclusive proof against

retaliation."  Marra, 497 F.3d at 302 (quoting Robinson, 982 F.2d at 894 (citation omitted)); see

also Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997) ("It is important to

emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's

prima facie case, and temporal proximity merely provides an evidentiary basis from which an

inference can be drawn.").  As a result, when there is a gap between protected activity and the

alleged retaliation, courts are to examine specific actions taken in the interim.  Such actions may

include but are not limited to "actual antagonistic conduct or animus against the employee."

Marra, 497 F.3d at 302.

PNC moves to dismiss Morales claim for retaliation on two grounds.[6]  First, it notes that

Morales's retaliation claim as it pertains to her complaints of religious discrimination has already

been addressed by this court when it earlier dismissed Morales' religious discrimination claim for

failure to exhaust administrative remedies.  With regards to her retaliation claim as it pertains to

complaints of racial and national origin based discrimination, PNC argues that (1) Morales has

not presented evidence of the causation element of her claim, and, alternatively, (2) Morales

cannot prove that PNC's non-retaliatory reason for terminating her employment was pretextual.

### 1.       Morales's Claim of Retaliation for Complaints of Religious Discrimination

In a previous opinion, the Court granted PNC's Motion to Dismiss Morales' religious

---

[6]Defense also moves to strike a portion of Morales's sworn declaration.  (Docket No. 39.)
The statement at issue, however, in is not relied upon in Defendant's motion for summary
judgment.  Therefore, the motion will be denied as moot.

discrimination claim for its failure to exhaust administrative remedies.  In doing so, we wrote:

> If the religious discrimination claims were really, as Plaintiff now asserts, 'the essence of her claims . . . that PNC discriminated against her **and retaliat[ed] against her** once she expressed her religious affiliation as a practicing Jehovah's [W]itness,' . . . reason suggests that she would have made at least cursory mention of such claims in either her EEOC Intake Form, EEOC Complaint, or PHRC Complaint.  She did not do so and is thus barred from raising them here.

Morales v. PNC Bank, N.A., No.Civ.A.10-1368, 2011 WL 3425644, at *10 (E.D. Pa. Aug. 4, 2011) (emphasis added) (internal citation omitted).  As we noted in that ruling, in Plaintiff's EEOC filings only checked off racial discrimination and retaliation and only set forth facts to establish such racial discrimination and retaliation.  Id.  As a result, because the EEOC did not investigate the underlying facts which gave rise to the retaliation claim, she cannot be said to have exhausted her administrative remedies with regards to *either* a claim for religious discrimination or retaliation for having expressed her religious affiliation.

     In arguing to the contrary, Plaintiff places undue reliance on a case and argument this court already rejected in its previous ruling: namely this Court's decision in Irizarry v. Commonwealth of Pa., Dept. of Transp., No. Civ.A.98-6180, 1999 WL 269917, (E.D. Pa. Apr. 19, 1999).  In that matter, this Court engaged in a brief four-sentence discussion of the exhaustion issue and found that the inquiry "must await further factual development of the case, in particular, facts concerning the investigation conducted by the EEOC."  Id. at *3.  As we noted in ruling on Morales' claim then, unlike in Irizarry this Court had full access to Plaintiff's administrative filings and was in a position in which it could determine the basis for Plaintiff's administrative charges and the reasonable scope of the EEOC investigation that ensued. Morales, 2011 WL 3425644 at *8-9.

Additionally, the alleged protected activity upon which Morales bases her religious discrimination claim—her refusal to attend the 2006 Halloween party—was not mentioned in her filings with the EEOC.  Moreover, pursuant to Morales' PHRC Charge of Discrimination, the EEOC investigation only encompassed events that resulted in her placement on probation and her subsequent disciplinary action, a period covering June 2007 to April 2008.  (Def.'s Mot. to Dismiss, Ex. C.)  Thus, the investigation did not look into the allegations made regarding the Halloween party.

Because this court already ruled that Morales did not exhaust her administrative remedies, the court must grant Defendant's motion as it pertains to retaliation for complaints of religious discrimination.

> **2.** **Morales' Claim of Retaliation for Complaints of Racial or National Origin Discrimination**

Defendant also moves for summary judgment on Morales's retaliation claim as it pertains to racial or national origin discrimination by claiming: (1) Morales has not presented evidence of the causation element of her claim, and, alternatively, (2) Morales cannot prove that PNC's non-retaliatory reason for terminating her employment was pretextual.

Before being able to determine whether Morales's termination was caused by her engaging in Title VII protected activity, however, there must be a finding of actual protected activity.  Having already noted that Plaintiff's complaints about the Halloween party were not covered by the EEOC investigation and, in any event, did not mention race or national origin, the burden is on Plaintiff to demonstrate that she engaged in activity protected under Title VII.  The Court finds that Plaintiff has failed to do so.  Although Morales filed a rebuttal note in response

to being placed on probation, nowhere in this note does she complain about racial or national

origin discrimination.  Rather, the note discusses why Morales feels that she is doing everything

in her power to meet her goals and be successful.  Similarly, in the November 2007 e-mail she

sent to Mr. Gilani, Morales remarks that she is trying to succeed.  She then comments that it is

difficult for her to make her numbers while being moved around to different offices, and because

the Rydal branch customers are generally elderly and not well suited for the products she is

licensed to sell.  Nowhere in these two writings, however, does she mention that she feels she has

been the target of discrimination.

Additionally, Morales's call to the ERIC hotline on or around April 4, 2007 does not

constitute protected activity under Title VII.  Plaintiff admittedly did not mention on the call that

she felt she was the target of discrimination or retaliation.  Rather, the only things she mentioned

were: (1) that she was not being paid commissions after being placed on probation, and (2) that

Ms. Altbregen had special lunch privileges in the Rydal Branch.  (Morales Dep.157:19–158:5,

163:21–164:10; Pl.'s Resp. to Def.'s Statement of Undisputed Facts, Ex. I, ERIC Call Log.)  She

claims this was done because she did not feel comfortable lodging complaints about

discrimination or retaliation.  (Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 45.)  Her

failure to raise any complaints about discrimination, retaliation, or any other activity protected

under Title VII, however, prevents the call from being considered a protected activity.

Even if Morales's call or complaints were protected activity, she still fails to demonstrate

that her being placed on probation and her eventual termination were caused by these complaints.

First, temporal proximity is lacking between Morales's phone call and the action taken against

her.  She remained in her position for over a year after the call to the ERIC hotline before being

22

discharged.  Moreover, in the interim, there is no indication that PNC acted with any antagonism towards Morales.  Instead, the company followed its corrective process by giving her verbal warnings, written warnings, and a probationary period during which she was given the opportunity to improve her numbers.  Morales's managers met with her and gave her an opportunity to improve her performance.  She did not do so.  Nothing in the facts suggests that the actions taken against her were outside of the normal policies and procedures PNC takes with employees who fail to consistently meet their numbers.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment. Plaintiff has failed to meet her burden to demonstrate that she was the target of discrimination on the basis of race or national origin.  The only mention of such discrimination occurred after she was terminated by PNC.  Moreover, Plaintiff has not demonstrated that there were similarly situated employees outside her protected classes who were treated more favorably than she.  As to her retaliation claims, Plaintiff has not demonstrated she engaged in any protected activity, as she never filed any complaints about discrimination prior to her termination.  Even if she had done so, there is no evidence in the record suggesting a causal connection between her complaints and her eventual termination.  Therefore, the Court will grant Defendant's Motion for Summary Judgment on all remaining counts (I, III, IV, and V).

An appropriate Order follows.